IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | | |
|---|---|---|
| PHARMACY CORPORATION OF AMERICA d/b/a PHARMERICA | ) ) ) | |
| PLAINTIFFS | ) ) | |
| v. | ) ) | Case No. _____ |
| CHAIM SCHEINBAUM; JEFFREY VEGH; DANIELLA SCHWARTZ; ARI (ALAN) SCHWARTZ; JOSEPH SCHWARTZ; ROSIE SCHWARTZ; LOUIS SCHWARTZ; JACK JAFFA; COHASSET CARE, LLC; COHASSET CARE AND REHABILITATION CENTER LLC; ZENITH CARE, LLC; ZENITH CARE HG LLC; SARATOGA CENTER FOR CARE, LLC; SARATOGA CARE AND REHABILITATION CENTER, LLC; LEXINGTON CARE AND REHABILITATION CENTER LLC; SKYLINE HEALTH CARE, LLC; SKYLINE MANAGEMENT GROUP LLC; ALLIANCE HC 11 LLC; ALLIANCE NJ CARE LLC; MOUNTAIN VIEW CARE AND REHABILITATION CENTER LLC; BLOOMSBURG CARE AND REHABILITATION CENTER, LLC; and BROOKHAVEN CARE LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| DEFENDANTS. | ) | |

**COMPLAINT**

Plaintiff Pharmacy Corporation of America d/b/a PharMerica ("PharMerica"), for its

Complaint against Chaim Scheinbaum ("Scheinbaum"); Jeffrey Vegh ("Vegh"); Daniella

Schwartz ("Daniella Schwartz"); Ari (Alan) Schwartz ("Ari Schwartz"); Joseph Schwartz

("Joseph Schwartz"); Rosie Schwartz ("Rosie Schwartz"); Louis Schwartz ("Louis Schwartz");

Jack Jaffa ("Jaffa" and together with Scheinbaum, Vegh, Daniella Schwartz, Ari Schwartz,

Joseph Schwartz, Rosie Schwartz, and Louis Schwartz, the "Individual Defendants"); Cohasset

Care, LLC ("Cohasset Care"); Cohasset Care and Rehabilitation Center LLC ("CCRC"); Zenith

Care, LLC ("Zenith Care"); Zenith Care HG LLC ("Zenith HG" and together with Zenith Care,

"Zenith"); Saratoga Center for Care, LLC ("Saratoga Center for Care"); Saratoga Care and

Rehabilitation Center, LLC ("SCRC"); Lexington Care and Rehabilitation Center LLC

("LCRC"); Skyline Health Care, LLC ("Skyline Health"); Skyline Management Group LLC

("Skyline Management" and together with Skyline Health, "Skyline"); Alliance HC 11 LLC

("Alliance 11"); Alliance NJ Care LLC ("Alliance Care"); Mountain View Care and

Rehabilitation Center, LLC ("Mountain View"); Bloomsburg Care and Rehabilitation Center,

LLC ("Bloomsburg"); and Brookhaven Care LLC ("Brookhaven"), states as follows:

## NATURE OF ACTION

1.      This is an action by PharMerica, a former vendor of pharmacy goods and services

for a skilled nursing facility located in Cohasset, Massachusetts, to recover amounts due to it for

providing such goods and services.  While PharMerica has obtained judgments against Cohasset

Care, the operator of the facility, and CCRC, the manager of the facility since 2017, for the

goods and services Cohasset Care used and for which it did not pay PharMerica, PharMerica is

unable to collect on its judgments due to the pillaging of the funds of Cohasset Care by the

individuals in control of them: Vegh, Daniella Schwartz, Ari Schwartz, Scheinbaum, Jaffa,

Joseph Schwartz, Rosie Schwartz, and Louis Schwartz.

2.      The Individual Defendants treated Cohasset Care as a piggy bank for themselves,

to the detriment of Cohasset Care's creditors.  Although Cohasset Care was insolvent from 2014

2

on – the entire time it operated the facility – the Individual Defendants caused Cohasset Care to pay themselves and other entities under their control and ownership in excess of $2,000,000 during that time, the vast bulk of which was stolen away in 2017 through 2019.

3.      These transfers were both actually and constructively fraudulent.  All were made while Cohasset Care was insolvent, none of them were for anything approaching reasonably equivalent value (or for any value at all), and all of them were done to benefit the Individual Defendants to the detriment of creditors such as PharMerica that were owed money by Cohasset Care.

4.      In fact, many of the funds stolen by Defendants were actually PharMerica's pursuant to Medicare law, which required that Cohasset Care use the funds it received from Medicare to pay PharMerica for the goods and services it provided, and which strictly prohibits (and criminalizes) the embezzlement, stealing, conversion, and intentional misapplication of Medicare funds from their required uses.

5.      Further, as evidenced by the excessive transfers of funds from Cohasset Care to other Defendants and Defendants' complete failure to abide by corporate formalities, the veil of corporate separateness should be pierced and all Defendants held liable to PharMerica for the amounts due under its judgments against Cohasset Care and CCRC.

## PARTIES

6.      PharMerica is a California corporation with a principal place of business in Louisville, Kentucky.  For diversity purposes, it is a citizen of California and Kentucky.

7.      Scheinbaum is an individual that resides in, and is a citizen of, New Jersey.

8.      Vegh is an individual that resides in, and is a citizen of, New York.

9.      Daniella Schwartz is an individual that resides in, and is a citizen of, New York.

10.    Ari Schwartz is an individual that resides in, and is a citizen of, New York.

11.    Joseph Schwartz is an individual that resides in, and is a citizen of, New York.

12.    Rosie Schwartz is an individual that resides in, and is a citizen of, New York.

13.    Louis Schwartz is an individual that resides in, and is a citizen of, New York.

14.    Jaffa is an individual that resides in, and is a citizen of, New York.

15.    Cohasset Care is a Delaware limited liability company.  Its present members are Daniella Schwartz and Jeffrey Vegh.  Therefore, it is a citizen of New York for diversity purposes.

16.    CCRC is a Delaware limited liability company.  Its present members are Scheinbaum and Jaffa.  Therefore, it is a citizen of New Jersey and New York for diversity purposes.

17.    Zenith Care is a Delaware limited liability company.  Its members are Vegh and Ari Schwartz.  Therefore, it is a citizen of New York for diversity purposes.

18.    Zenith HG is a Delaware limited liability company.  Its member is Vegh. Therefore, it is a citizen of New York for diversity purposes.

19.    Saratoga Center for Care is a New York limited liability company.  Its members are Ari Schwartz and Vegh. Therefore, it is a citizen of New York for diversity purposes.

20.    SCRC is a New Jersey limited liability company.  Its members are Scheinbaum and Jaffa.  Therefore, it is a citizen of New Jersey and New York for diversity purposes.

21.    LCRC is a Delaware limited liability company.  Its member is Scheinbaum. Therefore, it is a citizen of New Jersey for diversity purposes.

22.    Skyline Health is a New Jersey limited liability company.  Its member is Joseph Schwartz.  Therefore, it is a citizen of New York for diversity purposes.

23.     Skyline Management is a New Jersey limited liability company.  Its member is Joseph Schwartz.  Therefore, it is a citizen of New York.

24.     Alliance 11 is a New Jersey limited liability company.  Its members are Scheinbaum, Louis Schwartz, and Jaffa.  Therefore, it is a citizen of New Jersey and New York for diversity purposes.

25.     Alliance Care is a New Jersey limited liability company.  Its member is Scheinbaum.  Therefore, it is a citizen of New Jersey.

26.     Mountain View is a Pennsylvania limited liability company.  Its members are Scheinbaum, Jaffa, and Louis Schwartz.  Therefore, it is a citizen of New Jersey and New York for diversity purposes.

27.     Bloomsburg is a Pennsylvania limited liability company.  Its members are Scheinbaum, Jaffa, and Louis Schwartz.  Therefore, it is a citizen of New Jersey and New York for diversity purposes.

28.     Brookhaven is a New Jersey limited liability company.  Its member is Scheinbaum.  Therefore, it is a citizen of New Jersey for diversity purposes.

## JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

30.     This Court has personal jurisdiction over Defendants because of their conduct of business in Massachusetts, their tortious actions in Massachusetts, and their conspiracy and tortious actions to avoid debts incurred and judgments entered in Massachusetts by transferring assets from Cohasset, which has a principal place of business in Massachusetts.  Further,

Cohasset Care and CCRC have principal places of business in Massachusetts and the remaining

Defendants are alter egos of Cohasset Care and CCRC.

31.     Venue is proper in this district because the events giving rise to the claim

occurred in this district and because Defendants are subject to personal jurisdiction in this

district.

**FACTUAL ALLEGATIONS**

**A.  The skilled nursing facility business generally.**

32.     Skilled nursing facilities, commonly called nursing homes, are operated by

entities that apply for and receive licenses from agencies in the state in which the skilled nursing

facility is located.  In Massachusetts, for example, skilled nursing facility operators receive their

licenses from the Division of Health Care Facility Licensure and Certification.

33.     Most individuals involved in ownership of skilled nursing facilities set up a single

purpose entity to be the licensed operator of each facility they own, and separately set up entities

that are alleged "management" companies to which the facilities then pay "management" fees,

oftentimes regardless of whether services are actually provided by such "management" company

that would justify the management fees being paid.

34.     The individual owners can then pay themselves in multiple ways, including but

not limited to the following: withdrawing money directly from the licensed operating entity of

each facility; placing themselves on payroll with each facility operator and/or the management

company; and through payment of management fees to the management company entity, from

which the individual owners can withdraw funds.

35.     Nearly all licensed skilled nursing facility operating entities contract with Medicare and Medicaid to provide services to individuals covered by such governmental programs at their facility.

36.     The vast bulk of revenue for nearly all skilled nursing facility operators comes from Medicare and Medicaid.

37.     To qualify for payment by Medicare for treatment of patients covered by Medicare Part A, a skilled nursing facility must furnish a variety of care related services, including, for instance, providing necessary therapy services and drugs and other pharmacy services to such patients.

38.     Skilled nursing facilities can fulfill their obligation to provide services to patients by either doing it themselves or contracting with an outside entity, known as an under arrangements provider under federal law.

39.     PharMerica is an under arrangements provider that provides pharmacy goods and services to skilled nursing facilities.

40.     Generally, PharMerica is able to bill covered drugs directly to Medicaid, Medicare Part D Plans, and private insurers.  Accordingly, most of the charges on its invoices to skilled nursing facilities consist of drugs delivered for Medicare Part A residents since PharMerica cannot bill Medicare Part A directly and must be reimbursed by the skilled nursing facility as set forth below.

41.     For providing care to Medicare Part A patients, skilled nursing facility operators receive a per diem payment that is intended to cover all necessary services the skilled nursing facility provided to each patient for each day the patient was at the facility.  This is known in the business as "consolidated" billing.

42.     The skilled nursing facility operator must then use such consolidated payment to cover all costs it incurred in providing care to the patient.  This includes paying under arrangements providers pursuant to the contractual arrangements between the operator and the under arrangements providers.

43.     According to Medicare, if an operator does not reimburse its under arrangements provider, then there is no valid arrangement under federal law, the services provided by the operator would not be covered, and the operator would be in violation of the terms of its provider agreement with Medicare and potentially subject to penalties.  *See* Medicare Claims Processing Manual, Ch. 6, § 10.4.1.

44.     Further, federal law expressly prohibits (and criminalizes) using Medicare funds except for their intended purposes:

> Whoever knowingly and willfully embezzles, steals, or otherwise without authority converts to the use of any person other than the rightful owner, or intentionally misapplies any of the moneys, funds, securities, premiums, credits, property, or other assets of a health care benefit program [which includes Medicare and Medicaid], shall be fined under this title or imprisoned not more than 10 years, or both . . . .

18 U.S.C. § 669.

**B.  The defendants.**

45.     Cohasset Care was the licensed operator of a skilled nursing facility located at 1 Chief Justice Cushing Highway, Cohasset, Massachusetts 02025 (the "Cohasset Facility") until the Cohasset Facility was closed in or around May 1, 2019.

46.     Cohasset Care's members are Vegh and Daniella Schwartz.  Those two, along with Daniella Schwartz's husband, Ari Schwartz, controlled Cohasset Care.

47.     Vegh, Daniella Schwartz, and Ari Schwartz also operated other nursing homes under the management of Zenith, which was owned by Vegh and for which Ari Schwartz was the Chief Executive Officer.

48.     Among the other nursing homes controlled by Vegh, Daniella Schwartz, and Ari Schwartz was one located in Ballston Spa, New York  for which Saratoga Center for Care held the license to operate (the "Saratoga Facility") and one in Lexington, Massachusetts (the "Lexington Facility").

49.     CCRC was formed in February 2017.  Upon information and belief, its initial members were Jaffa and Louis Schwartz, who is the son of Joseph Schwartz and Rosie Schwartz.

50.     At the time CCRC was formed, Joseph Schwartz, Rosie Schwartz, and Louis Schwartz controlled a large-scale, nationwide nursing home operation that generally went by the trade name "Skyline."  As Vegh, Daniella Schwartz, and Ari Schwartz used Zenith to manage the nursing facilities under their control, Joseph Schwartz, Rosie Schwartz, and Louis Schwartz used Skyline to manage their nursing facilities.

51.     When CCRC was formed, Jack Jaffa executed the Certificate of Formation, while Louis Schwartz applied for CCRC's employer identification.  The initial filings listed a principal address for CCRC of 40 Vreeland Avenue, Suite 105, Totowa, New Jersey 07512, an office used by Skyline.

52.     In February of 2017, around when CCRC was formed, Cohasset Care and CCRC entered into an Operations Transfer Agreement and a Management Services Agreement. Pursuant to the Operations Transfer Agreement, Cohasset Care would transition operations of the Cohasset Facility to CCRC upon approval by the Massachusetts Division of Health Care Facility Licensure and Certification for CCRC to become the licensed operator of the Cohasset Facility.

Pursuant to the Management Services Agreement, CCRC would become the "manager" of the Cohasset Facility until that date occurred, and thus would have control (with and on behalf of Cohasset Care) of the Cohasset Facility, its operations, and, most critically, its funds.

53.     Upon information and belief, Saratoga Center for Care entered into similar agreements with SCRC with respect to the Saratoga Facility, and the Zenith-related entity that was licensed to operate the Lexington Facility entered into similar agreements with LCRC with respect to the Lexington Facility.

54.     Upon information and belief, Jaffa, Joseph Schwartz, Rosie Schwartz, and Louis Schwartz all had control over CCRC, SCRC, and LCRC.

55.     Upon information and belief, at some point during 2017, Scheinbaum obtained joint control over CCRC, SCRC, and LCRC with Jaffa, Joseph Schwartz, Rosie Schwartz, and Louis Schwartz.

56.     Scheinbaum managed nursing homes through Alliance Care, a nursing home management company of which he was the sole member.  As was the case with the Cohasset Facility, the Saratoga Facility, and the Lexington Facility, Scheinbaum often shared ownership and control over skilled nursing facilities in which he had an interest with some or all of Jaffa, Joseph Schwartz, Rosie Schwartz, and Louis Schwartz.

57.     By virtue of their control over CCRC, SCRC, and LCRC and the Operations Transfer Agreements/Management Agreements referenced above, Scheinbaum, Jaffa, Joseph Schwartz, Rosie Schwartz, and Louis Schwartz had control over the Cohasset Facility, the Saratoga Facility, and the Lexington Facility, including the funds relating to such facilities.

58.     Ultimately, membership interests in CCRC, SCRC, and LCRC were transferred to Scheinbaum, such that Scheinbaum became a 50% member of CCRC and SCRC with Jaffa and the sole member of LCRC.

59.     While LCRC was issued a license for the Lexington Facility and became its licensed operator, CCRC and SCRC never obtained licenses for the Cohasset Facility and the Saratoga Facility, although they maintained control over those skilled nursing facilities pursuant to the Management Agreements with Cohasset Care and Saratoga Center for Care.

60.     In or around May of 2019, the Cohasset Facility ceased operations and closed.

61.     Scheinbaum, Jaffa, and Louis Schwartz also jointly own and control Mountain View, Bloomsburg, and Alliance 11.

62.     Mountain View is the licensed operator of a skilled nursing facility located in Scranton, Pennsylvania (the "Mountain View Facility").

63.     Bloomsburg is the licensed operator of a skilled nursing facility located in Bloomsburg, Pennsylvania (the "Bloomsburg Facility").

64.     Alliance 11 is the licensed operator of a skilled nursing facility in Andover, New Jersey (the "Andover Facility").

65.     Joseph Schwartz, Rosie Schwartz, and Louis Schwartz also owned and controlled a skilled nursing facility in East Orange, New Jersey (the "Brookhaven Facility") through an entity called Kenbrook Associates Ltd., L.P.

66.     In or around May of 2018, dozens of Skyline's nursing homes throughout the country failed, requiring receiverships in numerous states.  Around that time, Scheinbaum and Joseph Schwartz, Rosie Schwartz, and Louis Schwartz created Brookhaven to take over the operations of the Brookhaven Facility.  Upon information and belief, they made Scheinbaum the

sole member of Brookhaven to avoid scrutiny over the Brookhaven Facility given the national

scrutiny being heaped on the Schwartzes and Skyline resulting from the receiverships.

Nevertheless, in reality, Joseph Schwartz, Rosie Schwartz, and Louis Schwartz maintained joint

control over the Brookhaven Facility and its finances and funds with Scheinbaum.  Brookhaven

operated the Brookhaven Facility until mid-2019, when the operations were transferred to a

different operator.

### C. Cohasset Care fails to pay PharMerica amounts due and owing, and PharMerica obtains judgments against Cohasset Care and CCRC and seeks to collect on them.

67.     In November of 2014, Cohasset Care executed a Pharmacy Services Agreement

("PSA") with PharMerica for PharMerica to provide pharmacy goods and services to the

residents of the Cohasset Facility from PharMerica's pharmacy in Brockton, Massachusetts in

exchange for compensation from Cohasset Care.

68.     Cohasset Care failed to pay PharMerica's invoices for pharmacy goods and

services provided.

69.     The PSA provided, among other things, that PharMerica is entitled to its costs of

collecting amounts due and owing from Cohasset Care.

70.     Cohasset Care was reimbursed by Medicare for all or most of the pharmacy goods

and services PharMerica provided for Medicare Part A patients at the Cohasset Facility.

Cohasset Care was required, by Medicare law, to use such reimbursement to pay PharMerica.

71.     PharMerica filed suit against Cohasset Care to collect amounts due and owing

from Cohasset Care on August 16, 2017 in the United States District Court for the District of

Massachusetts, which suit was captioned *Pharmacy Corporation of America d/b/a PharMerica*

*v. Cohasset Care, LLC d/b/a Harborview Center for Nursing and Rehabilitation*, Case No. 1:17-

cv-11515 (the "Cohasset Care Action").

72.     At the time PharMerica filed the Cohasset Care Action, Cohasset Care had outstanding invoices from PharMerica for goods and services provided that stretched back to March of 2016.

73.     On November 15, 2017, the Court in the Cohasset Care Action entered a default judgment (the "Cohasset Care Judgment") against Cohasset Care in favor of PharMerica in the amount of $183,120.78, plus post-judgment interest at the rate of 1.55%. The amount of the default judgment included attorneys' fees and costs through entry of that judgment.

74.     Cohasset Care and PharMerica entered into a Settlement Agreement dated as of March 6, 2018 (the "Settlement Agreement") by and between PharMerica; Cohasset Care; Saratoga Center for Care; and Chem Rx Pharmacy Services, LLC ("Chem Rx," which is an affiliate of PharMerica that provided pharmacy goods and services to a skilled nursing facility operated by Saratoga Center for Care for which Chem Rx was owed money by Saratoga Center for Care). CCRC and SCRC executed the Settlement Agreement as guarantors of the respective debts of Cohasset Care to PharMerica and Saratoga Center for Care to Chem Rx

75.     The Settlement Agreement did not require PharMerica to release or dismiss the judgment against Cohasset Care upon execution, but provided that PharMerica would forbear from collecting upon the Cohasset Care Judgment unless Cohasset Care failed to make payments due under the Settlement Agreement.

76.     Scheinbaum executed the Settlement Agreement on behalf of Cohasset Care and CCRC.

77.     Cohasset Care and CCRC failed to make any payments under the Settlement Agreement.

78.     Upon information and belief, Scheinbaum, Cohasset Care, and CCRC never intended to comply with the Settlement Agreement and instead intended to use it to delay efforts by PharMerica to collect on its judgment against Cohasset Care.

79.     On May 22, 2018, PharMerica filed suit against CCRC in the United States District Court for the District of Massachusetts, which suit was captioned *Pharmacy Corporation of America d/b/a PharMerica*, Case No. 1:18-cv-11069 (the "CCRC Action" and together with the Cohasset Care Action, the "Actions").

80.     The Court in the CCRC Action entered a default judgment (the "CCRC Judgment" and together with the Cohasset Care Judgment, the "Judgments") against CCRC and in favor of PharMerica on August 20, 2018 in the amount of $196,518.79, plus post-judgment interest at the rate of 2.45%.  The amount of the CCRC Judgment included the amount due by Cohasset Care under the Cohasset Care Judgment plus additional interest and attorneys' fees and costs incurred since entry of the Cohasset Care Judgment.

81.     PharMerica thereafter sought to conduct post-judgment discovery on the Judgments.  Specifically, PharMerica issued post-judgment discovery requests concerning assets and transfers of assets by Cohasset Care and CCRC.

82.     Cohasset Care and CCRC initially ignored PharMerica's post-judgment discovery requests.

83.     After PharMerica filed motions to compel discovery responses and document production and sought to compel post-judgment examinations of Cohasset Care and CCRC through motions for supplementary process in the Actions, Cohasset Care and CCRC finally produced certain documents to PharMerica, beginning on April 24, 2019, regarding the financial condition of Cohasset Care and CCRC.  It was only based on documents produced beginning

14

April 24, 2019 and thereafter (and that were thereafter subpoenaed by PharMerica due to the inadequate production by Cohasset Care and CCRC) that PharMerica became aware that Defendants stole all of Cohasset Care's assets.  Defendants had hid all the transfers in this Complaint from PharMerica at all times prior.

84.     Scheinbaum was the signatory on the post-judgment discovery responses provided to PharMerica.

85.     Even though Cohasset Care and CCRC initially provided certain documents and information, Cohasset Care and CCRC still hid relevant information and documents from PharMerica to prevent PharMerica from understanding the full nature and amounts stolen by Defendants from Cohasset Care and to prevent PharMerica from knowing the assets Cohasset Care currently had.

86.     For instance, Cohasset Care and CCRC declined to provide bank statements from certain accounts they had, including an account at Rockland Trust.

87.     Moreover, Cohasset Care and CCRC provided documents from an account at J.P. Morgan Chase Bank, N.A. ("Chase") in the name of Cohasset Care, but the statements provided to PharMerica ran only through March of 2018, suggesting that the bank account had been closed at that time.  The only bank statements provided for months after March of 2018 (through March of 2019) were statements from an account at Signature Bank ("Signature") in the name of CCRC.

88.     Even after counsel for PharMerica pointed out to counsel for Cohasset Care and CCRC in a May 15, 2019 letter that "it seems readily apparent that not all bank statements have been provided" since the revenues during 2018 were significantly higher than the amount being

deposited into CCRC's Signature account, Scheinbaum, Cohasset Care, and CCRC represented that there were no further bank statements to provide.

89.     In fact, however, the Chase account in Cohasset Care's name remained open until December 2019.  In May of 2019 – the same month counsel for PharMerica notified Cohasset Care and CCRC that it seemed apparent there should be additional bank statements – in excess of $100,000 was deposited in the Chase account by governmental payors (*i.e.* Medicare and Medicaid) to pay for services Cohasset Care rendered patients of the Cohasset Facility before it closed.  All funds received in such account were transferred out of the account almost immediately after receipt; as detailed below, $63,000 was transferred to Alliance Care, and another $1,700 was transferred to Saratoga Center for Care.

90.     Upon information and belief, Scheinbaum, for his own benefit and the benefit of the various entities to which he was transferring the money, hid the continuing receipt of funds by Cohasset Care in the Chase account from PharMerica to prevent execution by PharMerica on that account to attempt to satisfy its Judgments.

91.     Accordingly, PharMerica's efforts at executing on the Judgments only resulted in the collection of $17,422.71 from the Signature account.

92.     In September of 2019, to avoid the impending post-judgment examinations of Cohasset Care and CCRC, Cohasset Care and CCRC offered to settle the Judgments on certain terms and conditions, including payments to PharMerica in three installments due on October 10, 2019; December 10, 2019; and February 10, 2020, and agreement not to contest PharMerica's right to the amounts attached by PharMerica in the Signature account.  PharMerica agreed to accept such terms to resolve the Judgments, and agreed to forbear from collection on the amounts due under the Judgments if, and while, Cohasset Care and CCRC made such payments.

93.     However, PharMerica only received the first installment due on October 10, 2019. Cohasset Care and CCRC failed to make the payments due on December 10, 2019 and February 10, 2020.

**D.  Despite the judgment debtors' insolvencies, the individuals controlling it steal all of Cohasset Care's money at the expense of creditors and for the benefit of defendants.**

94.     Meanwhile, even as Cohasset Care and then CCRC were refusing to pay PharMerica amounts due to them and avoiding PharMerica's efforts to collect on its judgment, the individuals controlling Cohasset Care and CCRC were stealing significant amounts of money from Cohasset Care for themselves and other entities under their control.

95.     According to its financial statements, Cohasset Care suffered net losses in excess of $1 million every year from 2014 through 2018.

96.     For each year from 2014 through 2018, Cohasset Care's year-end balance sheet reflected that it had liabilities that were, at a minimum, double the value of its assets.

97.     As noted above, Cohasset Care failed to pay the total amount due for PharMerica's invoices issued in March of 2016 and thereafter.

98.     At all relevant times, Cohasset Care was insolvent.

99.     Notwithstanding the insolvency of Cohasset Care and its inability and refusal to pay its creditors (such as PharMerica), the individuals in control of Cohasset Care – Vegh, Daniella Schwartz, and Ari Schwartz – were regularly withdrawing money from Cohasset Care to pay themselves and Zenith.

100.    Specifically, from May of 2014 to September of 2016, Cohasset Care transferred $150,000 to Vegh, which funds Vegh withdrew on a monthly basis in the amount of $5,000 per month.  The exact dates of each of these payments are reflected on Exhibit A.

101.    From May of 2014 through April of 2016, Cohasset Care transferred $125,000 to Ari Schwartz and Daniella Schwartz.  As with Vegh, these payments were made on a monthly basis in the amount of $5,000 per month.  The exact dates of each of these payments are reflected on Exhibit B.

102.    Additionally, from May of 2014 through September of 2016, Cohasset Care transferred another $144,700 to Zenith, which funds were transferred on the dates and in the amounts reflected on Exhibit C.

103.    The $419,700 transferred from Cohasset Care to Vegh, Ari Schwartz, Daniella Schwartz, and Zenith between May of 2014 and September of 2016 was not for any reasonably equivalent value.

104.    The funds were conveyed while Cohasset Care was insolvent, and the remaining assets in Cohasset Care's possession after these transfers were unreasonably small for Cohasset Care to continue to operate the Cohasset Facility.

105.    The transfers totaling $419,700 from Cohasset Care to Vegh, Ari Schwartz, Daniella Schwartz, and Zenith between May of 2014 and September of 2016 were made when Cohasset Care believed or reasonably should have believed that it would incur debts beyond its ability to pay them as they became due.

106.    The $419,700 transferred from Cohasset Care to Vegh, Ari Schwartz, Daniella Schwartz, and Zenith between May of 2014 and September of 2016 was made with the intent and purpose of concealing funds and hindering, delaying or defrauding creditors, including PharMerica, and for the benefit of Cohasset Care's members, Vegh and Ari and Daniella Schwartz, and of Vegh's Zenith entities.

107.     Upon information and belief, Vegh, Ari Schwartz, and Daniella Schwartz knowingly participated in the scheme to fraudulently transfer funds for the purpose of hiding the assets to hinder, delay, or defraud PharMerica, as evidenced by numerous badges of fraud, including the following:

     a.   The transfers were to insiders;

     b.   The transfers were concealed from creditors;

     c.   The transfers were made at the time Cohasset Care was incurring debts to PharMerica;

     d.   The transfers were made when PharMerica was making demands for payment;

     e.   The transfers were made without Cohasset Care receiving reasonably equivalent value; and

     f.   The transfers were made when Cohasset Care was insolvent.

108.     As noted above, by early 2017, pursuant to the agreements between Cohasset Care and CCRC, Jaffa, Joseph Schwartz, Rosie Schwartz, Louis Scwhartz, and Scheinbaum gained control of the Cohasset Facility and Cohasset Care's funds with Vegh, Ari Schwartz, and Daniella Schwartz.

109.     Rather than using the funds received by Cohasset Care to pay its own bills and operating expenses (including PharMerica's then-oustanding invoices), Jaffa, Joseph Schwartz, Rosie Schwartz, Louis Schwartz, and Scheinbaum used Cohasset Care's funds to enrich themselves and to support their other entities and businesses, in addition to continuing to make payments to Vegh.

110.     For instance, between March of 2017 and April of 2018, Cohasset Care transferred $710,936.46 to the Skyline entities controlled by Joseph Schwartz, Rosie Schwartz,

and Louis Schwartz.  The date, amount, and Skyline entities to which such funds were transferred are set forth in Exhibit D.

111.    The $710,936.46 transferred from Cohasset Care to the Skyline entities between March 2017 and April 2018 was not for any reasonably equivalent value.

112.    There was no legitimate business reason for the transfer of these funds.  There is no contemporaneous documentation indicating that such funds were for a loan or repayment of a loan.

113.    The funds were conveyed while Cohasset Care was insolvent and the remaining assets in Cohasset Care's possession after the transfers were unreasonably small for Cohasset Care to continue to operate the Cohasset Facility.

114.    The transfers totaling $710,936.46 from Cohasset Care to the Skyline entities between March 2017 and April 2018 were made when Cohasset Care believed or reasonably should have believed that it would incur debts beyond its ability to pay them as they became due.

115.    The $710,936.46 transferred from Cohasset Care to the Skyline entities between March 2017 and April 2018 was made with the intent and purpose of concealing funds and hindering, delaying or defrauding creditors, including PharMerica, and for the benefit of Joseph Schwartz, Rosie Schwartz, Louis Schwartz, and the Skyline entities.

116.    Upon information and belief, Skyline and Joseph Schwartz, Rosie Schwartz, and Louis Schwartz knowingly participated in the scheme to fraudulently transfer funds for the purpose of hiding the assets to hinder, delay, or defraud PharMerica, as evidenced by numerous badges of fraud, including the following:

        a.  The transfers were to insiders;

        b.  The transfers were concealed from creditors;

    c.   The transfers were made at the time Cohasset Care was incurring or had already incurred debts to PharMerica;

    d.   The transfers were made when PharMerica was making demands for payment, when PharMerica had sued Cohasset Care for payment, and after PharMerica had obtained a judgment against Cohasset Care;

    e.   The transfers were made without Cohasset Care receiving reasonably equivalent value; and

    f.   The transfers were made when Cohasset Care was insolvent.

117.    Additionally, although Scheinbaum was not actually employed at the Cohasset Facility, Scheinbaum put himself on the payroll of the Cohasset Facility, from which he was paid on a bi-weekly basis.  In 2017, Cohasset Care paid Scheinbaum $73,125 in ostensible wages.  In 2018 and from January through June 2019, Scheinbaum received another $121,573.60 in ostensible wages.

118.    Scheinbaum also received transfers outside of these payments via payroll in the amount of $4,889.73 on August 27, 2018; $700 on March 28, 2019; and $1,196.41 on March 29, 2019.

119.    The ostensible "wages" and other payments Cohasset Care paid Scheinbaum were excessive and unreasonable and bore no relationship to the work performed by Scheinbaum for Cohasset Care and the Cohasset Facility.

120.    The ostensible "wages" and other payments Cohasset Care paid Scheinbaum were not for any reasonably equivalent value.

121.    The funds were conveyed to Scheinbaum while Cohasset Care was insolvent, and the remaining assets in Cohasset Care's possession after the payments were unreasonably small for Cohasset Care to continue to operate the Cohasset Facility.

122.    The ostensible "wages" and other payments Cohasset Care paid Scheinbaum were taken by Scheinbaum when Cohasset Care believed or reasonably should have believed that it would incur debts beyond its ability to pay them as they became due.

123.    Scheinbaum stole the ostensible "wages" and other payments from Cohasset Care with the intent and purpose of concealing funds and hindering, delaying or defrauding creditors, including PharMerica, and for the benefit of Scheinbaum.

124.    Scheinbaum knowingly participated in the scheme to fraudulently transfer funds for the purpose of hiding the assets to hinder, delay, or defraud PharMerica, as evidenced by numerous badges of fraud, including the following:

    a.  The transfers were to insiders;

    b.  The transfers were concealed from creditors;

    c.  The transfers were made at the time Cohasset Care was incurring or had already incurred debts to PharMerica;

    d.  The transfers were made when PharMerica was making demands for payment, when PharMerica had sued Cohasset Care for payment, and after PharMerica had obtained a judgment against Cohasset Care;

    e.  The transfers were made without Cohasset Care receiving reasonably equivalent value; and

    f.  The transfers were made when Cohasset Care was insolvent.

125.     Cohasset Care also transferred nearly $250,000 to Alliance Care, which was owned and controlled by Scheinbaum.  The dates and amounts of these transfers are detailed on Exhibit E.

126.     The nearly $250,000 transferred from Cohasset Care to Alliance Care was not for any reasonably equivalent value.

127.     There was no legitimate business reason for the transfer of these funds.  There is no contemporaneous documentation indicating that such funds were for a loan or repayment of a loan.

128.     The funds were conveyed while Cohasset Care was insolvent and the remaining assets in Cohasset Care's possession after the transfers were unreasonably small for Cohasset Care to continue to operate the Cohasset Facility.

129.     The nearly $250,000 transferred from Cohasset Care to Alliance Care was transferred when Cohasset Care believed or reasonably should have believed that it would incur debts beyond its ability to pay them as they became due.

130.     The nearly $250,000 transferred from Cohasset Care to Alliance Care was done with the intent and purpose of concealing funds and hindering, delaying or defrauding creditors, including PharMerica, and for the benefit of Alliance Care and its principal, Scheinbaum.

131.     Alliance Care and Scheinbaum knowingly participated in the scheme to fraudulently transfer funds for the purpose of hiding the assets to hinder, delay, or defraud PharMerica, as evidenced by numerous badges of fraud, including the following:

     a.   The transfers were to insiders;

     b.   The transfers were concealed from creditors;

    c.   The transfers were made after Cohasset Care had incurred debts to PharMerica;

    d.   The transfers were made after PharMerica had sued Cohasset Care for payment, and also after PharMerica had obtained a judgment against Cohasset Care;

    e.   The transfers were made without Cohasset Care receiving reasonably equivalent value; and

    f.   The transfers were made when Cohasset Care was insolvent.

132.    Cohasset Care made numerous transfers to the other entities controlled and owned by the Individual Defendants that operated and controlled the Saratoga Facility, the Lexington Facility, the Mountain View Facility, the Brookhaven Facility, and the Andover Facility.

133.    Between March of 2017 and April of 2019, Cohasset Care transferred $369,941.49 to or for the benefit of Saratoga Center for Care and SCRC.  These transfers include the following:

    a.   Payments in March and April 2017 and in May 2019 totaling $293,581.35 transferred directly to Saratoga Center for Care for it and SCRC's use and benefit, as detailed on Exhibit F; and

    b.   Payments set forth in detail on Exhibit G in May through September 2018 totaling $78,060.14 to 149 Ballston Avenue, LLC, which, upon information and belief, are transfers from Cohasset Care to pay rent due by Saratoga Center for Care and SCRC to the landlord of the Saratoga Facility.

134.    On October 9, 2017, Cohasset Care transferred $3,319.85 to Alliance 11.

135.    Cohasset Care transferred $105,121.88 to Brookhaven on November 13, 2018.

136.    On February 25, 2019, Cohasset Care transferred $117,000.00 to Mountain View.

137.    Between September 2017 and October 2019, Cohasset Care transferred $77,025.41 to LCRC.

138.    The transfers to Saratoga, LCRC, Brookhaven, Mountain View, and Alliance 11 were not for any reasonably equivalent value.

139.    There was no legitimate business reason for the transfer of these funds.  There is no contemporaneous documentation indicating that such funds were for a loan or repayment of a loan.

140.    The funds were conveyed while Cohasset Care was insolvent, and the remaining assets in Cohasset Care's possession after the transfers were unreasonably small for Cohasset Care to continue to operate the Cohasset Facility.

141.    The transfers to Saratoga, LCRC, Brookhaven, Mountain View, and Alliance 11 were made when Cohasset Care believed or reasonably should have believed that it would incur debts beyond its ability to pay them as they became due.

142.    The transfers to Saratoga, LCRC, Brookhaven, Mountain View, and Alliance 11 were done with the intent and purpose of concealing funds and hindering, delaying or defrauding creditors, including PharMerica, and for the benefit of the Individual Defendants and Saratoga, LCRC, Brookhaven, Mountainview, and Alliance 11.

143.    Upon information and belief, the Individual Defendants and Saratoga, LCRC, Brookhaven, Mountainview, and Alliance 11 knowingly participated in the scheme to fraudulently transfer funds for the purpose of hiding the assets to hinder, delay, or defraud PharMerica, as evidenced by numerous badges of fraud, including the following:

      a.   The transfers were to insiders;

    b.   The transfers were concealed from creditors;

    c.   The transfers were made at the time Cohasset Care was incurring or had already incurred debts to PharMerica;

    d.   The transfers were made when PharMerica was making demands for payment, when PharMerica had sued Cohasset Care for payment, and after PharMerica had obtained a judgment against Cohasset Care;

    e.   The transfers were made without Cohasset Care receiving reasonably equivalent value; and

    f.   The transfers were made when Cohasset Care was insolvent.

144.    Finally, as noted above, Cohasset Care continued to make payments to its member, Vegh, in 2017 and into January 2018.  From July 2017 to January 2018, Cohasset Care transferred a total of $22,250 to Vegh, in the amounts of $3,750 on July 7, August 7, September 5, and December 6, 2017 and January 8, 2018, and $3,500 on November 6, 2017.

145.    The payments Cohasset Care paid Vegh in 2017 and 2018 were excessive and unreasonable and bore no relationship to any work performed by Vegh for Cohasset Care and the Cohasset Facility.

146.    The payments Cohasset Care paid Vegh in 2017 and 2018 were not for any reasonably equivalent value.

147.    The payments were made while Cohasset Care was insolvent and the remaining assets in Cohasset Care's possession after the payments were unreasonably small for Cohasset Care to continue to operate the Cohasset Facility.

148.    The payments Cohasset Care made to Vegh in 2017 and 2018 were made when Cohasset Care believed or reasonably should have believed that it would incur debts beyond its ability to pay them as they became due.

149.    The payments Cohasset Care made to Vegh in 2017 and 2018 were made with the intent and purpose of concealing funds and hindering, delaying or defrauding creditors, including PharMerica, and for the benefit of Vegh.

150.    Upon information and belief, Vegh knowingly participated in the scheme to fraudulently transfer funds for the purpose of hiding the assets to hinder, delay, or defraud PharMerica, as evidenced by numerous badges of fraud, including the following:

   a.   The transfers were to insiders;

   b.   The transfers were concealed from creditors;

   c.   The transfers were made at the time Cohasset Care was incurring or had already incurred debts to PharMerica;

   d.   The transfers were made when PharMerica was making demands for payment, when PharMerica had sued Cohasset Care for payment, and after PharMerica had obtained a judgment against Cohasset Care;

   e.   The transfers were made without Cohasset Care receiving reasonably equivalent value; and

   f.   The transfers were made when Cohasset Care was insolvent.

**E.  Defendants abused the corporate form and ignored corporate formalities.**

151.    As set forth in the preceding section, the Individual Defendants pillaged the funds of Cohasset Care for themselves and their entities.  They did so even as creditors that provided critical goods and services for Cohasset Care's patients that Cohasset Care needed in order to

receive reimbursement from Medicare and Medicaid, such as PharMerica, were not paid and could not collect on judgments.

152.    These transfers to benefit the Individual Defendants and their entities at the expense of Cohasset Care's creditors are illustrative of the lack of regard for the corporate form displayed by Defendants.

153.    The Individual Defendants had ownership control over the various entity Defendants as set forth above.

154.    The Individual Defendants had pervasive control over Cohasset Care and the other entity Defendants.  As detailed above, they used such pervasive control to transfer to themselves and/or their other entities large sums of money.

155.    While they did so, Cohasset Care was completely insolvent and had insufficient capitalization to conduct its business and pay its bills.

156.    In addition to transfers detailed above, Defendants further intermingled business assets among the various entities by, on some occasions, causing other entity Defendants to pay debts of Cohasset Care or transferring cash to Cohasset Care due to its minimal capitalization, much as they used Cohasset Care's funds as a piggy bank to fund the expenses of such other entity Defendants.

157.    For instance, Bloomsburg, not Cohasset Care or CCRC, made the payment in the amount of $25,000 to PharMerica under the second settlement agreement between it and Cohasset Care and CCRC before Cohasset Care and CCRC breached that agreement by failing to make further payments due thereunder.

158.     Further, upon information on belief and as noted above and set forth on Exhibit G, on several occasions in 2018, the Defendants used Cohasset Care's funds to pay the rent owed by Saratoga Center for Care and SCRC for the Saratoga Facility.

159.     At various times, the Individual Defendants also transferred funds from other facilities to Cohasset Care, albeit not nearly as much as the Individual Defendants transferred to themselves and to other entities from Cohasset Care.

160.     For example, while Cohasset Care transferred over $350,000 to Saratoga Center for Care as detailed above and in Exhibits F and G, on other occasions, Saratoga Center for Care made transfers to Cohasset Care in excess of $100,000.

161.     LCRC also transferred significant funds to Cohasset Care, in addition to making payments directly to Vegh.

162.     Upon information and belief, Defendants do not regularly maintain corporate records and do not have operating agreements for each of the entity Defendants.

163.     The Individual Defendants do not view the entities they own and control as separate legal entities that have their own existence.

164.     Joseph Schwartz has gone so far as to state under oath in a 2017 deposition that "Skyline is an entity that is me," while admitting that he regularly drew money out of nursing facilities he owned, including as much as one million dollars in a year from a single facility.  He also stated that just because vendors send bills for the goods and services they provide does not mean that such vendors should necessarily be paid.

165.     At least one court has previously held that Skyline and other Joseph Schwartz-affiliated entities made numerous intercompany transfers and failed to observe corporate formalities.

166.     Upon information and belief, the Individual Defendants regularly take money from facilities under their control, whether directly or via other entities they own, regardless of the financial condition of such facilities or their abilities to pay creditors, much as they did with the Cohasset Facility.

167.     The aforementioned fraudulent transfers are a direct product of the Defendants' lack of regard for the corporate forms of the legal entities involved.

168.     Each of the aforementioned fraudulent transfers were concealed from PharMerica by the Defendants.

169.     Tellingly, even after the Cohasset Facility closed in May of 2019, during which time PharMerica was actively seeking documents and information to attempt to collect on its judgment, Cohasset Care received in excess of $100,000 that Scheinbaum, Alliance Care, and Saratoga stole from it, rather than paying it to PharMerica.  As noted above, the only payment ever voluntarily made to PharMerica in relation to its judgment was from Bloomsburg.

**COUNT I – FRAUDULENT TRANSFER (UNDER MASS. G.L. c. 109A § 5(A)(1))**
**(Against Vegh, Ari Schwartz, Daniella Schwartz, Skyline, Scheinbaum, Alliance Care, LCRC, Zenith, Saratoga, Mountain View, Brookhaven, and Alliance 11)**

170.     PharMerica incorporates by reference the allegations set forth above.

171.     Cohasset Care is a debtor as defined in Mass. G.L. c. 109A § 2.

172.     PharMerica is a creditor as defined in Mass. G.L. c. 109A § 2.

173.     Cohasset Care has made transfers fraudulently, in violation of Mass. G.L. c. 109A § 5 and otherwise with actual intent to hinder, delay, or defraud PharMerica as follows, *inter alia*:

a.  From May of 2014 to September of 2016, Cohasset Care transferred $150,000

    to Vegh, which funds were transferred as $5,000 on a monthly basis, as

    reflected on Exhibit A.

b.  From May of 2014 through April of 2016, Cohasset Care transferred $125,000

    to Ari and Daniella Schwartz.  As with Vegh, these payments were made on a

    monthly basis in the amount of $5,000 per month, as reflected on Exhibit B.

c.  From May of 2014 through September of 2016, Cohasset Care transferred

    $144,700 to Zenith, on the specific dates and in the specific amounts reflected

    on Exhibit C.

d.  Between March of 2017 and April of 2018, Cohasset Care transferred

    $710,936.46 to the Skyline entities controlled by Joseph Schwartz, Rosie

    Schwartz, and Louis Schwartz.  The date, amount, and Skyline entities to

    which such funds were transferred are set forth in Exhibit D.

e.  In 2017, Cohasset Care paid Scheinbaum $73,125 in ostensible wages and an

    additional $121,573.60 in ostensible wages from 2018 June 2019. Further,

    Cohasset Care also transferred Scheinbaum $4,889.73 on August 27, 2018;

    $700 on March 28, 2019; and $1,196.41 on March 29, 2019.

f.  Between October of 2017 and May of 2019, Cohasset Care also transferred

    nearly $250,000 to Alliance Care, which was owned and controlled by

    Scheinbaum, as set forth in detail on Exhibit E.

g.  Between March of 2017 and April of 2019, Cohasset Care transferred

    $369,941.49 to or for the benefit of Saratoga Center for Care and SCRC, as

    set forth in Exhibits F and G.

31

    h.  On October 9, 2017, Cohasset Care transferred $3,319.85 to Alliance 11.

    i.  On November 13, 2018, Cohasset Care transferred $105,121.88 to Brookhaven.

    j.  On February 25, 2019, Cohasset Care transferred $117,000.00 to Mountain View.

    k.  Between September 2017 and October 2019, Cohasset Care transferred $77,025.41 to LCRC.

    l.  From July 2017 to January 2018, Cohasset Care transferred a total of $22,250 to Vegh, in the amounts of $3,750 on July 7, August 7, September 5, and December 6, 2017 and January 8, 2018, and $3,500 on November 6, 2017.

174.    All of the above-listed transfers were made with the actual intent to hinder, delay, and defraud PharMerica in that:

    a.  Cohasset Care made the transfers without receiving a reasonably equivalent value in exchange for each transfer or obligation;

    b.  Cohasset Care was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction and/or intended to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due;

    c.  Cohasset Care was controlled by Vegh, Ari Schwartz, and Daniella Schwartz, who, along with all Defendants, disregarded the corporate forms of the legal entities involved and therefore retained possession or control of the funds transferred after the transfers;

d.   the transfers were concealed;

e.   the transfers were made as Cohasset was incurring debts to PharMerica, when PharMerica was making demands for payment to Cohasset, and after Cohasset care had been sued by PharMerica and a judgment was entered against it;

f.   the Defendants knew or should have known that PharMerica held a valid and enforceable judgment against Cohasset Care and was actively seeking to collect on it;

g.   the transfers collectively represent substantially all of the available assets of the Cohasset Care;

h.   Cohasset Care either already was insolvent at the time of the transfers or became insolvent as a result of the transfers;

i.   the transfers occurred while and after a substantial debt was incurred by the defendants to PharMerica; and

j.   all of the transfers of the funds were to insiders of Cohasset Care.

175.   The aforementioned fraudulent transfers caused a near total diminution of Cohasset Care's assets that otherwise would have been available to PharMerica for collection of its judgment.

176.   As a direct and proximate result of Cohasset's Care's fraudulent transfers, PharMerica has suffered pecuniary damages.

**COUNT II – FRAUDULENT TRANSFER (UNDER MASS. G.L. C. 109A §5(A)(2))**
**(Against Vegh, Ari and Daniella Schwartz, Skyline, Scheinbaum, Alliance Care, LCRC, Zenith, Saratoga, Mountain View, Brookhaven, and Alliance 11)**

177.   To the extent not inconsistent with this Count II, PharMerica incorporates by reference the allegations set forth above.

178.   Cohasset Care is a debtor as defined in Mass. G.L. c. 109A §2.

179.     PharMerica is a creditor as defined in Mass. G.L. c. 109A §2.

180.     Cohasset Care has made transfers fraudulently, in violation of Mass. G.L. c. 109A §5(a)(2) as follows, *inter alia*:

    a.  From May of 2014 to September of 2016, Cohasset Care transferred $150,000 to Vegh, which funds were transferred as $5,000 on a monthly basis, as reflected on Exhibit A.

    b.  From May of 2014 through April of 2016, Cohasset Care transferred $125,000 to Ari and Daniella Schwartz.  As with Vegh, these payments were made on a monthly basis in the amount of $5,000 per month, as reflected on Exhibit B.

    c.  From May of 2014 through September of 2016, Cohasset Care transferred $144,700 to Zenith, on the specific dates and in the specific amounts reflected on Exhibit C.

    d.  Between March of 2017 and April of 2018, Cohasset Care transferred $710,936.46 to the Skyline entities controlled by Joseph Schwartz, Rosie Schwartz, and Louis Schwartz.  The date, amount, and Skyline entities to which such funds were transferred are set forth in Exhibit D.

    e.  In 2017, Cohasset Care paid Scheinbaum $73,125 in ostensible wages and an additional $121,573.60 in ostensible wages from 2018 June 2019. Further, Cohasset Care also transferred Scheinbaum $4,889.73 on August 27, 2018; $700 on March 28, 2019; and $1,196.41 on March 29, 2019.

    f.  Between October of 2017 and May of 2019, Cohasset Care also transferred nearly $250,000 to Alliance Care, which was owned and controlled by Scheinbaum, as set forth in detail on Exhibit E.

g.   Between March of 2017 and April of 2019, Cohasset Care transferred
$369,941.49 to or for the benefit of Saratoga Center for Care and SCRC, as
set forth in Exhibits F and G.

h.   On October 9, 2017, Cohasset Care transferred $3,319.85 to Alliance 11.

i.   On November 13, 2018, Cohasset Care transferred $105,121.88 to
Brookhaven.

j.   On February 25, 2019, Cohasset Care transferred $117,000.00 to Mountain
View.

k.   Between September 2017 and October 2019, Cohasset Care transferred
$77,025.41 to LCRC.

l.   From July 2017 to January 2018, Cohasset Care transferred a total of $22,250
to Vegh, in the amounts of $3,750 on July 7, August 7, September 5, and
December 6, 2017 and January 8, 2018, and $3,500 on November 6, 2017.

181.   Cohasset Care made each transfer without receiving a reasonably equivalent value
in exchange for the transfer.

182.   At the time of each transfer, Cohasset Care was engaged or was about to engage
in a business or a transaction for which its remaining assets were unreasonably small in relation
to the business or transaction it intended to incur.

183.   At the time of each transfer, Defendants believed or reasonably should have
believed that Cohasset Care would incur debts beyond its ability to pay as they became due.

184.   The aforementioned fraudulent transfers caused a near total diminution of
Cohasset Care's assets that otherwise would have been available to PharMerica for collection of
its judgment.

185.   As a direct and proximate result of Cohasset's Care's fraudulent transfers, PharMerica has suffered pecuniary damages.

**COUNT III – FRAUDULENT TRANSFER (UNDER MASS. G.L. C. 109A §6)**
**(Against Vegh, Ari and Daniella Schwartz, Skyline, Scheinbaum, Alliance Care, LCRC, Zenith, Saratoga, Mountain View, Brookhaven, and Alliance 11)**

186.   To the extent not inconsistent with this Count III, PharMerica incorporates by reference the allegations set forth above.

187.   Cohasset Care is a debtor as defined in Mass. G.L. c. 109A §2.

188.   PharMerica is a creditor as defined in Mass. G.L. c. 109A §2.

189.   Cohasset Care has made transfers fraudulently, in violation of Mass. G.L. c. 109A §6 as follows, *inter alia*:

a.   From May of 2014 to September of 2016, Cohasset Care transferred $150,000 to Vegh, which funds were transferred as $5,000 on a monthly basis, as reflected on Exhibit A.

b.   From May of 2014 through April of 2016, Cohasset Care transferred $125,000 to Ari and Daniella Schwartz.  As with Vegh, these payments were made on a monthly basis in the amount of $5,000 per month, as reflected on Exhibit B.

c.   From May of 2014 through September of 2016, Cohasset Care transferred $144,700 to Zenith, on the specific dates and in the specific amounts reflected on Exhibit C.

d.   Between March of 2017 and April of 2018, Cohasset Care transferred $710,936.46 to the Skyline entities controlled by Joseph Schwartz, Rosie Schwartz, and Louis Schwartz.  The date, amount, and Skyline entities to which such funds were transferred are set forth in Exhibit D.

e.  In 2017, Cohasset Care paid Scheinbaum $73,125 in ostensible wages and an additional $121,573.60 in ostensible wages from 2018 June 2019. Further, Cohasset Care also transferred Scheinbaum $4,889.73 on August 27, 2018; $700 on March 28, 2019; and $1,196.41 on March 29, 2019.

f.  Between October of 2017 and May of 2019 Cohasset Care also transferred nearly $250,000 to Alliance Care, which was owned and controlled by Scheinbaum, as set forth in detail on Exhibit E.

g.  Between March of 2017 and April of 2019, Cohasset Care transferred $369,941.49 to or for the benefit of Saratoga Center for Care and SCRC, as set forth in Exhibits F and G.

h.  On October 9, 2017, Cohasset Care transferred $3,319.85 to Alliance 11.

i.  On November 13, 2018, Cohasset Care transferred $105,121.88 to Brookhaven.

j.  On February 25, 2019, Cohasset Care transferred $117,000.00 to Mountain View.

k.  Between September 2017 and October 2019, Cohasset Care transferred $77,025.41 to LCRC.

l.  From July 2017 to January 2018, Cohasset Care transferred a total of $22,250 to Vegh, in the amounts of $3,750 on July 7, August 7, September 5, and December 6, 2017 and January 8, 2018, and $3,500 on November 6, 2017.

190.  Cohasset Care made each transfer without receiving a reasonably equivalent value in exchange for the transfer

191.    Cohasset Care was insolvent at the time of each transfer or became insolvent as a result of the transfer in violation of Mass. G.L. c. 109A §6(a).

192.    Further, Cohasset Care made the foregoing transfers to an insider while Cohasset Care was insolvent, and each insider had reasonable cause to believe that Cohasset Care was insolvent when each transfer was made.

193.    The aforementioned fraudulent transfers caused a near total diminution of Cohasset Care's assets that otherwise would have been available to PharMerica for collection of its judgment.

194.    As a direct and proximate result of Cohasset's Care's fraudulent transfers, PharMerica has suffered pecuniary damages.

## COUNT IV – AIDING AND ABETTING FRAUDULENT TRANSFER
### (Against the Individual Defendants)

195.    To the extent not inconsistent with this Count IV, PharMerica incorporates by reference the allegations set forth above.

196.    As set forth above, Cohasset Care effected numerous fraudulent transfers to or for the benefit of the Defendants in violation of Mass. G.L. c. 109A.

197.    The Individual Defendants were fully aware that Cohasset Care was liable to PharMerica for the judgment against it when the fraudulent transfers were made and knew that Cohasset Care was fraudulently transferring the funds with the actual intent to hinder, delay, and defraud PharMerica.

198.    The Individual Defendants provided Cohasset Care with substantial assistance in causing the fraudulent transfers to be effected in that they controlled Cohasset Care and the other Defendant entities who received the fraudulently transferred funds, and they instituted all transfers or caused them to be instituted on Cohasset Care's behalf.

199.    As a direct and proximate result of the Individual Defendants' efforts to aid and abet Cohasset Care with its fraudulent transfers, PharMerica has suffered pecuniary damages.

## COUNT V – CIVIL CONSPIRACY TO COMMIT FRAUDULENT TRANSFER
### (Against all Defendants)

200.    To the extent not inconsistent with this Count V, PharMerica incorporates by reference the allegations set forth above.

201.    As established above, Cohasset Care effected numerous fraudulent transfers to or for the benefit of the Defendants in violation of Mass. G.L. c. 109A.

202.    The Defendants acted in concert and in furtherance of a common design to defraud PharMerica of the money it is rightfully owed and prevent PharMerica from collecting on the Judgments, while simultaneously enriching themselves using Cohasset Care's funds, including those received from government payors for application toward the care and treatment of its nursing facility residents.

203.    Pursuant to and as a product of the Defendants' conspiracy, the Defendants effected the above-described fraudulent transfers.

204.    As a direct and proximate result of the Defendants' conspiracy and the fraudulent transfers stemming therefrom, PharMerica has suffered pecuniary damages.

## COUNT VI – BREACH OF CONTRACT/PIERCING THE CORPORATE VEIL
### (Against All Defendants)

205.    To the extent not inconsistent with this Count VI, PharMerica incorporates by reference the allegations set forth above.

206.    PharMerica has been awarded Judgments against Cohasset Care and CCRC for breach of contracts between PharMerica and Cohasset Care and CCRC.

207.    The other Defendants besides Cohasset Care and CCRC are liable to PharMerica for such Judgments.

208.    The entity Defendants are "alter egos" of one another and of the Individual Defendants.

209.    Upon information and belief, each entity Defendant is owned, operated, managed, or otherwise controlled in a manner by the Individual Defendants which is inconsistent with its being a separate and distinct legal entity, such that to allow the Defendants to assert limited liability or hide behind the "corporate veil" would protect a fraud and promote a gross injustice.

210.    PharMerica is entitled to pierce the entity Defendants' respective veils to recover from any and all of the Defendants the amounts owed by Cohasset Care and CCRC to PharMerica.

## COUNT VII – FRAUD
### (Against Scheinbaum)

211.    To the extent not inconsistent with this Count VII, PharMerica incorporates by reference the allegations set forth above.

212.    As previously set forth, after obtaining the Judgments, PharMerica instituted post-judgment discovery. Specifically, PharMerica issued post-judgment discovery requests concerning assets and transfers of assets by Cohasset Care and CCRC.

213.    The post-judgment discovery responses Cohasset Care and CCRC eventually provided to PharMerica were done at the direction of Scheinbaum, who was the signatory on said post-judgment discovery responses.

214.    The post-judgment discovery responses and documents produced by Cohasset Care and CCRC at the direction of Scheinbaum fraudulently omitted relevant information concerning the assets and transfers of Cohasset Care and CCRC, including, but not limited to, the

40

fact that the Cohasset Care Chase bank account not only remained open but continued to receive funds from government payors, which were quickly and fraudulently transferred out of the account for the benefits of certain Defendants.

215.    Pursuant to Federal Rules of Civil Procedure 33, 34, and 69(a)(2), Cohasset Care, CCRC, and Scheinbaum had a legal duty to provide full and accurate information and documentation in response to PharMerica's post-judgment discovery requests.

216.    Further, by undertaking to provide information and documents to PharMerica in response to its post-judgment discovery requests, Scheinbaum had a duty to provide full and accurate information and documentation, and could not provide misleading partial information and documents.

217.    Scheinbaum, on behalf of Cohasset Care and CCRC, purposely concealed and omitted information and documentation from PharMerica in the Cohasset Care and CCRC discovery responses, while materially misrepresenting other information about the entities' bank accounts and transfers of assets.

218.    Scheinbaum misrepresented certain facts while concealing and omitting others in order to prevent PharMerica from discovering Cohasset Care and CCRC assets available for attachment and collection in partial or full satisfaction of the Judgments, and Scheinbaum knew or reasonably should have known that such representations were false when he made them.

219.    Scheinbaum made these misrepresentations for his own benefit and the benefit of the various entities to which he was transferring the money.

220.    PharMerica relied on Scheinbaum's representations and productions of documents in its efforts to collect on the Judgments, and such reliance was reasonable.

221.     As a direct and proximate result of Scheinbaum's concealments, omissions, and misrepresentations, PharMerica has suffered pecuniary damages.

## COUNT VIII – INTENTIONAL MISREPRESENTATION
### (Against Scheinbaum)

222.     To the extent not inconsistent with this Count VIII, PharMerica incorporates by reference the allegations set forth above.

223.     As previously set forth, in response to PharMerica's post-judgment discovery requests, Scheinbaum, on behalf of Cohasset Care and CCRC, represented that its discovery responses and document productions were true, accurate, and complete.

224.     Scheinbaum's representations were false, and Scheinbaum knew they were false or was recklessly indifferent to their falsity when he made them. Scheinbaum at all times knew that Cohasset Care and CCRC had additional bank accounts and/or bank statements that were not disclosed in post-judgment discovery and that such bank accounts would be receiving additional funds from government payors in the future that could be applied to the Judgments.

225.     Scheinbaum intended that PharMerica would rely on the misrepresentations to its detriment. Scheinbaum knew that if he could delay or hinder PharMerica's post-judgment discovery attempts to uncover assets and sources of funds to satisfy the Judgments, that the Defendants would have enough time to steal any available assets from Cohasset Care to keep PharMerica from collecting them.

226.     PharMerica relied on Scheinbaum's representations, and its reliance on Scheinbaum's misrepresentations was reasonable.  PharMerica did not and could not have known of the falsity of Scheinbaum's representations.

227.     As a direct and proximate result of Scheinbaum's intentional misrepresentations, PharMerica has suffered pecuniary damages.

42

## COUNT IX – NEGLIGENT MISREPRESENTATION
### (Against Scheinbaum)

228.    To the extent not inconsistent with this Count IX, PharMerica incorporates by reference the allegations set forth above.

229.    As previously set forth, in response to post-judgment discovery requests, Scheinbaum, on behalf of Cohasset Care and CCRC, represented that its discovery responses and document productions were true, accurate, and complete.

230.    Due to Scheinbaum's failure to exercise reasonable care or competence in supplying this information to PharMerica, his representations were false, and he should have known they were false given the circumstances.

231.    Scheinbaum supplied the false information and failed to disclose other information to PharMerica for PharMerica's benefit and guidance in determining how to proceed with its post-judgment collection activities. Scheinbaum intended the false and incomplete information and documentation to influence PharMerica in this decision.

232.    PharMerica relied on Scheinbaum's representations, and PharMerica's reliance on Scheinbaum's misrepresentations was reasonable.  PharMerica did not and could not have known of the falsity of Scheinbaum's representations.

233.    As a direct and proximate result of Scheinbaum's misrepresentations, PharMerica has suffered pecuniary damages.

## COUNT X – CONVERSION
### (Against all Defendants)

234.    To the extent not inconsistent with this Count X, PharMerica incorporates by reference the allegations set forth above.

43

235.    PharMerica had a right to possession funds received by Cohasset Care from Medicare to pay PharMerica's invoices for drugs and pharmacy services provided to Cohasset Care's residents.

236.    If Cohasset Care did not pay PharMerica using such funds, the funds would have had to be returned to Medicare, which they were not.  Instead, Cohasset Care held them in trust for PharMerica.

237.    Defendants deprived PharMerica of the funds and instead stole them for their own use by transferring such funds from Cohasset Care to Vegh, Ari Schwartz, Daniella Schwartz, Skyline, Scheinbaum, Alliance Care, LCRC, Zenith, Saratoga Center for Care, Mountain View, Brookhaven, and Alliance 11.

238.    As a result of Defendants' conversion of PharMerica's funds, PharMerica has suffered damages, including that it has not been paid for the pharmacy goods and services provided by Cohasset Care, that it has lost the time value of its money, and that it has incurred substantial attorneys' fees and costs (and will continue to incur substantial attorneys' fees and costs to litigate this action) in seeking payment of its money.

239.    PharMerica is entitled to the imposition of a constructive trust on all Medicare funds received by Cohasset Care that were transferred to the other Defendants in this action.

## COUNT XI – BREACH OF FIDUCIARY DUTY
### (Against the Individual Defendants)

240.    To the extent not inconsistent with this Count XI, PharMerica incorporates by reference the allegations set forth above.

241.    The Individual Defendants all acted as officers, directors, and managers of Cohasset Care and had control over its funds.

242.    At all relevant times, Cohasset Care was insolvent.

44

243.     As officers, directors, and managers of an insolvent entity, the Individual

Defendants held the assets of Cohasset Care in trust for its creditors, including PharMerica, and

owed its creditors a fiduciary duty.

244.     The Individual Defendants breached their fiduciary duty to PharMerica by

stealing assets of Cohasset Care for themselves and their other entities rather than using such

assets to pay PharMerica the amounts it was owed for goods and services it provided Cohasset

Care.

245.     PharMerica has been damaged by the Individual Defendants' breach of their

fiduciary duties, including because PharMerica has not received payment of amounts due to it for

goods and services it provided, has lost the time value of money due to it, and has incurred

substantial attorneys' fees and costs (and will continue to incur substantial attorneys' fees and

costs to litigate this action) in seeking payment of its money.

**COUNT XII – VIOLATION OF MASS. G.L. c. 93A, §11**
**(Against all Defendants)**

246.     To the extent not inconsistent with this Count XII, PharMerica incorporates by

reference the allegations set forth above.

247.     As set forth in this Complaint, Defendants engaged in numerous unfair and

deceptive business practices in the Commonwealth of Massachusetts designed to prevent

PharMerica from collecting amounts due and owing to it and causing PharMerica to incur

substantial attorneys' fees and expenses in collecting such amounts.  These unfair and deceptive

business practices include the following:

      a.     Refusing to pay amounts due to PharMerica for PharMerica's critical goods

           and services provided to Cohasset Care;

    b.   Stealing Medicare funds that belonged to PharMerica and were required to be paid to PharMerica pursuant to federal law;

    c.   Stealing more than $2 million of Cohasset Care's assets to prevent PharMerica and other creditors from collecting amounts due to them;

    d.   Entering into a first settlement agreement with no intention of complying with it in order to delay and hinder PharMerica's collection efforts;

    e.   Providing false and misleading discovery responses and document productions to PharMerica to conceal Cohasset Care's assets and Defendants' pillaging of such assets for the benefit of the Individual Defendants and their other entities.

248.    Defendants acted willfully and knowingly in engaging in the foregoing deceptive and unfair business practices.

249.    As a result of the unfair and deceptive practices of Cohasset Care, CCRC, and Scheinbaum, PharMerica has suffered pecuniary damages, including attorneys' fees and expenses.

## PRAYER FOR RELIEF

WHEREFORE, PharMerica requests judgment against Defendants as follows:

A.    An award of compensatory damages in an amount to be proven at trial, jointly and severally against all Defendants;

B.    Treble damages due to Defendants' unfair and deceptive business practices;

C.    Prejudgment and post-judgment interest;

D.    PharMerica's attorneys' fees, expenses and costs associated with its collection of amounts owed to it by Defendants; and

E.     All other relief to which PharMerica may be entitled.

Plaintiff demands a trial by jury.


DATED:  April 23, 2020                    Respectfully submitted,

                                          The Plaintiff,

                                          PHARMACY CORPORATION OF AMERICA d/b/a
                                          PHARMERICA

                                          */s/ Mary Ellen MacDonald*
                                          Jeffrey E. Poindexter, BBO #631922
                                          Mary Ellen MacDonald, BBO #641658
                                          Bulkley, Richardson and Gelinas, LLP
                                          1500 Main Street, Suite 2700
                                          Springfield, MA 01115
                                          Tel: (413) 781-2820
                                          Fax: (857) 800-8249
                                          jpoindexter@bulkley.com
                                          mmacdonald@bulkley.com

                                          AND

                                          Matthew C. Williams *(pro hac vice admission to be
                                          sought)*
                                          FULTZ MADDOX DICKENS PLC
                                          101 South Fifth Street, 27th Floor
                                          Louisville, Kentucky 40202
                                          Tel: (502) 588-2000
                                          Fax: (502) 588-2020
                                          mwilliams@fmdlegal.com